MEMORANDUM OF DECISION
This memorandum of decision affects three minor children, Jonathan R., Lissette R. and Angelique R., whose parents are the subject of petitions for termination of their parental rights (TPR). On October 28, 1999, the Department of Children and Families (DCF) filed TPR petitions against Wanda A. and Ruperto G., the biological parents of Jonathan, who was born on September 1992; against Wanda A. and Douglas H., the biological parents of Lissette, who was born on March 1995; and against Wanda A. and Angel R., the biological parents of Angelique, who was born on October 1996.
As to Ruperto G., the petition alleges abandonment and lack of an ongoing parent-child relationship. Despite due notice of these proceedings,[2] he has failed to appear or to participate, and the court granted the petitioner's motion for a default on October 18, 2000. As to Douglas H., the petition alleges abandonment; that Jonathan was found in a prior proceeding to have been neglected and that the respondent father has failed to rehabilitate himself; and that there is no ongoing parent-child relationship. On July 12, 2000, Angel R. voluntarily consented to the termination of his parental rights regarding Angelique. The court finds the matters pending against Ruperto G. in favor of the petitioner. As to Douglas H., the court finds the grounds of abandonment CT Page 2475 and no ongoing relationship in favor of the petitioner, and finds the issues of failure to rehabilitate in favor of the respondent father.
As to Wanda A., as to each child, the petitioner has proceeded on the sole ground that the respondent mother has failed to rehabilitate herself.[3] For the reasons stated below, the court finds the issues related to rehabilitation in favor of the petitioner, but declines to terminate Wanda A.'s parental rights, as such action would not serve the best interests of the children in this case.
On August 21, 1997, following a court hearing, Jonathan, Lissette and Angelique were adjudicated neglected children, and were committed to DCF for a period of twelve months.[4] (Goldstein, J.). Thereafter, on July 2, 1998, the commitment was extended for an additional twelve months (Goldstein, J.); extended for an additional twelve months on July 28, 1999 (Rogers, J.); and extended again on June 28, 2000 (Frankel, J.).
The termination of parental rights trial was held on October 18, 19, 20 and 24, 2000. Douglas H. and Wanda A. were present at each court session with their attorneys. The petitioner and the minor children were represented by their respective counsel throughout the trial. Jonathan's court-appointed guardian ad litem (GAL) was also present throughout; counsel for Lissette and Angelique served concurrently as their GAL.
The parties introduced multiple documentary exhibits into evidence during the trial, including reports of psychological evaluations, records reflecting services, social studies, and a letter prepared by Wanda A. (Exhibit FF.) The parties also elicited testimony from multiple witnesses including a psychologist, mental health service providers, DCF staff members, the foster father and Wanda A.[5]
The court finds that the Child Protection Session of the Superior Court, Juvenile Matters division, has jurisdiction over the pending matter. No action is pending in any other court affecting custody of the children at issue.
 I. FACTUAL FINDINGS
The court has carefully considered the verified petitions, all of the evidence, including the social studies, psychological examinations, and the testimony presented, according to the standards required by law.[6]
Upon such consideration, the court finds that the following facts were proven by clear and convincing evidence at trial:
A. WANDA A., THE MOTHER
CT Page 2476
1. EVENTS PRIOR TO THE NEGLECT ADJUDICATION OF AUGUST 21, 1997
Wanda A. was born on November 15, 1972. She was twenty years old when her first child, Jonathan, was born. Lissette was born when Wanda A. was twenty-three, and Angelique was born when she was nearly twenty-five. Wanda A. and these children came to the attention of DCF in 1997 when it was reported that she had physically abused Jonathan. (Testimony of Dr. Swenson.) On July 17, 1997, DCF received an Order of Temporary Custody (OTC) affecting all three children, who have thereafter remained in DCF custody.
On July 29, 1997, Wanda A. was assigned expectations to facilitate the return of her children; these expectations were acknowledged as orders of the court on August 28, 1997. These expectations included specific requirements that she participate in individual counseling and parenting classes; remain free from involvement with the criminal justice system; and cooperate with and become involved in Jonathan's therapy.[7]
(Exhibit 1a.)
In late July 1997, Wanda A. commenced counseling sessions at Catholic Family Services (CFS), at the referral of DCF. She attended four sessions, missed two additional appointments, and thereafter did not return to this therapy. Accordingly, the agency closed its file. (Exhibits 9, 10; Testimony of Jennifer P.)
On December 5, 1997, Wanda A. was arrested and charged with theft of checks and funds from Irma D., her children's foster mother. This theft was alleged to have occurred on July 23, 1997. (Exhibits 3, 16.)
2. EVENTS FOLLOWING THE NEGLECT ADJUDICATION OF AUGUST 21, 1997
Wanda A.'s fourth child, Calep R. was born on May 1998.[8] (Exhibits 16, 17.)
On July 1, 1998, Wanda A. returned to CFS in a self-effort to obtain individual counseling. She was evaluated on July 10, 1998, but attended only seven of eleven appointments scheduled from July 22 through October 28, 1998. She was not able to identify a purpose for the counseling, and did not complete the sessions as she "had difficulty finding a self-directed goal, and resisted definition of the problem to include problematic behavior or parenting on her behalf." (Exhibit 5. See also Testimony of Jeanne C.)
On August 26, 1998, at the request of DCF, Wanda A. was evaluated for substance abuse issues at Advanced Behavioral Health, Inc. (ABH), a division of Guenster Rehabilitation Services, Inc. (Guenster). Although CT Page 2477 she denied use of cocaine, Wanda A. tested positive for this substance on that date. She was found to have a high level of denial with regard to her substance abuse issues, and treatment was therefore recommended. A subsequent test on January 11, 1999, indicated the presence of marijuana in Wanda A.'s bodily system, and drug treatment was again recommended. (Exhibit 11; Testimony of Jody K.) Wanda A. did not pursue drug treatment.
On December 30, 1998, Wanda A. executed a three month service agreement with DCF, requiring, among other things, that she would begin family work at the Curtis Home and advise DCF of any change in her address. (Exhibit 15.) On January 11, 1999, Wanda A. attended a pre-family therapy session at the Curtis Home, where Jonathan was receiving mental health treatment. Despite the Curtis Home's exemplary efforts in attempting to schedule other appointments that would enable Wanda A. to meet her other obligations, she failed to attend a number of sessions, and did not demonstrate significant interest in the family therapy process. Accordingly, the provider indicated that it would not provide family therapy for Wanda A. and her son, although treatment continued for Jonathan. (Exhibit 6; Testimony of Debra B.)
On September 15, 1999, in response to the charges from 1997, Wanda A. pled guilty to Larceny in the fourth degree (§ 53a-125). She was sentenced to serve 1 year, suspended, with two years of probation during which she was to make restitution of $800 in favor of Irma D. (Exhibits 3, WW.) On that date, she was also found guilty of Failure to Appear in the second degree (§ 53a-173), for an offense occurring on June 7, 1999, and received an unconditional discharge. Thereafter, on October 12, 1999, Wanda A. received a like sentence for a second charge of Failure to Appear in the second degree (§ 53a-173), for an offense occurring on April 26, 1999.[9] (Exhibit 3.)
From January through December 1999, a total of 43 visits were scheduled to take place between Wanda A. and her children, providing opportunities for nearly weekly contact: Wanda A. was able to keep 27, or 63%, of these visits.[10] (Exhibit 4-4.) With DCF's assistance and cooperation, visitation was often arranged so that Wanda A. was enabled her to meet her school obligations and to maintain employment, the latter being required by the specific steps. On most occasions when she could not attend visits, Wanda A. called in advance to advise DCF of her circumstances. During a great majority of the visits that did take place, Wanda A. was noted by DCF to have handled herself appropriately, and to have adequately attended to the children's needs, although occasional assistance was required in the area of limit-setting. (Testimony of Sheryl P.) CT Page 2478
Wanda A. has consistently contributed to the financial support of her three children in foster care. (Exhibits 16, R; Testimony of Wanda A.)
 3. EVENTS FOLLOWING THE FILING OF THE TERMINATION PETITION ON OCTOBER 28, 1999
In November of 1999, Wanda A. commenced individual counseling sessions with Mark A., a marriage and family therapy intern at Family Services Woodfield (FSW). She attended four of the ten counseling sessions scheduled from November 18 through January 19, 2000. The provider closed her case for nonattendance after Wanda A. failed to attend the last two scheduled appointments, and made no further contact with them. (Exhibits 13, 14, U; Testimony of Mark A.) Wanda A. was subsequently advised that FSW would reconsider her placement on their counseling rolls, but she has persistently failed to follow up with this agency. (Testimony of Carmen T.) Furthermore, DCF clearly advised Wanda A. that she was free to find a therapist with whom she was comfortable, if she could not develop a relationship with those to whom she had been referred.[11] (Testimony of Sheryl P.)
In February 2000, Carol Swenson, Ph.D., performed court-ordered evaluations of Wanda A., her children, and their fathers.[12] The evaluations took place over the course of six separate days, and included interactional and individualized evaluations.[13] (Exhibit 4a.) Dr. Swenson is a licensed psychologist who concentrates on marriage and family issues, and who has substantial experience in forensic evaluations. She found Wanda A. to have a personality disorder with attendant impulsivity and inflexibility, difficulty controlling her emotional reactions, and a tendency to rage and to blame others rather than herself when difficulties are encountered. Wanda A. was also identified as having a personality which was marked by depression, anxiety, paranoia, and difficulty in forming relationships. As Dr. Swenson noted: "Although [Wanda A.] would benefit from support services and help from others that might enable her to reduce her stress and be more available to her children, she is likely to sabotage such help." Wanda A. demonstrated superior skills at processing information, which enables her to succeed in school notwithstanding her average to low-average intellectual abilities. (Exhibit 4a; Testimony of Dr. Swenson.)
During her interactional sessions with her three older children, Wanda A. also displayed highly developed parenting skills. She was able to maintain the structure and activities of a successful family session during Dr. Swenson's one hour evaluation. Dr. Swenson described Wanda A.'s relationship with her children, thus revealed during this session, as being "wonderful." (Testimony of Dr. Swenson.) CT Page 2479
On April 26, 2000, Wanda A. underwent a substance abuse evaluation through the LMG Programs, Inc., another division of Guenster, also at DCF's request. She again presented with a high level of denial regarding any self-knowledge of drug use, even on a historical basis. Laboratory analysis performed on that date indicated that Wanda A. had not recently used illegal drugs. Wanda A. failed, however, to return for the multiple follow-up drug tests requested by DCF. Significantly, she persisted in providing the evaluator with inaccurate and inconsistent information about her mental health status. (Exhibit 12; Testimony of Jody K.)
From January through May 11, 2000, a total of 21 visits between Wanda A. and the children were scheduled by DCF. Wanda A. was able to attend 15, or approximately 70%, of these visits. During this period, Wanda A. resided in a city distant from the children, and she benefited from DCF's provision of transportation services. (Exhibit 4-4.) "The Social Work Case Aid who has supervised the visits has reported good visits, with good interactions. The children appear to enjoy their mother's company, and are sad when the visits end." (Exhibit 4-4.)
Wanda A. has been gainfully employed as a bilingual customer service representative, using her communications skills in English and Spanish, working first for Cablevision at its internet help support desk in Bridgeport, and currently at Dooney Bourke in Norwalk. Previously, Wanda had worked as a receptionist, proof operator, factory assembler, clothing store salesperson, and curtain store salesperson. (Exhibit 16.) She enrolled in college at the University of Bridgeport for the purpose of enabling her to provide a higher standard of living for her children through the acquisition of higher education. Although Wanda A. has completed her second year of college and plans to become a paralegal when she has completed her study, she is prepared to suspend her education for the time being, to more immediately attend to her childrens' needs. (Exhibit 12; Testimony of Dr. Swenson, Wanda A.) She has recently changed her work schedule from evening to daytime hours, and no longer works on weekends, making her more available to her children. (Testimony of Wanda A.)
B. RUPERTO G., FATHER OF JONATHAN
A paucity of factual information was presented concerning Ruperto G., other than his biological status as Jonathan's father. (Exhibit 16.)
C. DOUGLAS H., FATHER OF LISETTE
Douglas H. was born on April 22, 1970. (Exhibit 2.)[14] He is a high school graduate, and has worked as a computer operator technician. The CT Page 2480 father of two other children, Douglas H. had a brief liason with Wanda A. in 1994, prior to Lisette's birth. (Exhibit 16.)
Douglas H. has a long history of convictions for violence and drug-related offenses. On March 22, 1990, he was convicted of Possession of Narcotics in violation of § 21a-279 (a), and was sentenced to serve two years, suspended, with three years of probation. On October 15, 1992, he was convicted of Sale of Narcotics in violation of §21a-277 (a), and sentenced to serve three years, suspended, with three years of probation. On May 5, 1993, he was convicted of Assault in the third degree in violation of § 53a-61, and sentenced to serve six months, suspended, with one year of probation. On March 23, 1994, he was convicted of Unlawful Restraint in the second degree in violation of § 53a-96, and sentenced to serve 1 year, suspended, with one year of probation; and was also convicted of Possession of Narcotics in violation of § 21a-279 (a), for which he received like sentence, concurrent; and his outstanding probations were noted to have been violated, and were terminated. On April 7, 1995, he was again convicted of Possession of Narcotics in violation of § 21a-279 (a), and was sentenced to serve five years, suspended, with three years of probation; outstanding probation was also noted to be violated, and terminated. (Exhibits 1-1; see also Exhibit 2.)
Douglas H. continued his criminal involvement during the adjudicatory period. On August 2, 1999, he again was convicted of Sale of Narcotics, in violation of § 21a-277 (a), for events alleged to have occurred on September 25, 1998, and also convicted of Failure to Appear in the first degree in violation of § 53a-172; he was sentenced to serve three years, concurrent, for these offenses. Thereafter, on November 5, 1999, he was convicted of two additional counts of Sale of Narcotics, in violation of § 21a-277 (a), for events alleged to have occurred on September 14 and September 24, 1998; he was sentenced to serve three years, concurrent with his existing sentences, for each of these offenses. (Exhibit 2.)
Incarcerated at the time of trial, Douglas H. has completed two substance abuse programs sponsored by the department of corrections. (Exhibits 2-2, 3-3.)
D. THE CHILDREN
The evidence clearly and consistently established that all three children are very closely attached to Wanda A., whom they identify as their "mother." (E.g., testimony of Gayle M.) The children have remained together in foster care with Eduardo D. and Irma D., the paternal grandparents of Angelique. The children recognize Irma D. and Eduardo CT Page 2481 D., as providing their immediate parental care and guidance, and overall they feel safe and comfortable in their home. (Testimony of Dr. Swenson, Sheryl P., Exhibit T.)[15] The foster parents provide adequate housing and attention for the children, although they have a blood relation with Angelique, alone. The children and the foster parents have a strong and mutual bond. (Exhibit Y.) Eduardo D. seems relatively comfortable with Wanda A., although a hostile relationship exists between Wanda A. and Irma D. (Exhibit Y; Testimony of Wanda A.) With the exception of a single holiday visit in 1998, Wanda A. has not been welcome in the foster parents' home since the summer of 1997, following the larceny described in Part I. A. 1.
The children have consistently expressed their love for their mother, and enjoy being in her company.[16] (Exhibit 4-4; Testimony of Sheryl P., Carmen T., Eduardo G.) They have also developed a close affection for their younger half-sibling, Calep. (Exhibit Z.) Maintenance of their emotional bond with Wanda A. is vital to sustaining the children's healthy development, although their physical needs and safe-keeping are well provided for by others. (Testimony of Dr. Swenson.)
1. JONATHAN
Despite interventions, Jonathan remains an emotionally disturbed child who requires a significant amount of love, affection, validation and structure in his life. (Testimony of Dr. Swenson, Gayle M.) From August of 1997 through January of 1998, Jonathan received mental health services through the Child Guidance Clinic. (Testimony of Gayle M.) From March 1998 through February 25, 2000, Jonathan received treatment for his anger and behavior problems at the Curtis Home through its Extended Day Treatment Program. Upon discharge, the provider urged that the child receive therapeutic interventions on a regular basis, in an effort to maintain the progress he had made in controlling his chronic, disruptive behaviors. (Exhibit 8; Testimony of Stephanie S., Sheryl P.)
Jonathan is not a child who should be left to deal independently with his environment, and requires a primary caretaker who has time to meet his many needs. He considers Eduardo D. and Irma D. and his sisters to constitute his "family" at this time, despite his plain love and devotion towards his mother. (Testimony of Dr. Swenson, Gayle M.)
2. LISSETTE
Lissette is a self-reliant and undemanding child who is in need of psychotherapy to enhance her self-esteem. Lissette has a well-developed bond and attachment to her biological mother, as well, but she recognizes that Eduardo D. and Irma D. are now providing her with parental care and CT Page 2482 guidance on a daily basis. While Lissette felt warmly toward Douglas H. during her visits with him, she has limited understanding of his role in her life. She is not bonded to him in any way. (Testimony of Dr. Swenson.)
3. ANGELIQUE
Although she was only 9 months old when she came into the care of DCF, and despite the fact that she has been out of her mother's care for most of her life, Angelique is clearly bonded and well attached to Wanda A. She recognizes Eduardo D. and Irma D. as providing her with parental services at this time. (Testimony of Dr. Swenson.)
 II. ADJUDICATION
As to the adjudicatory phase of this hearing,[17] the court has considered the evidence and testimony related to circumstances and events following the adjudication of neglect on August 21, 1997 and until October 29, 1999, when the TPR was filed. The court has determined that statutory grounds for termination exist, as alleged, as to Ruperto G. and Douglas H. The court has concluded that the petitioner has met her burden of proof on the ground of failure to rehabilitate as Wanda A., but further finds that she has not abandoned her children, and that a valuable ongoing parent-children relationship exists in this case. The court has accordingly determined that the interests of Jonathan, Lissette and Angelique will not best be served at this time by termination of Wanda A.'s parental rights.
A. LOCATION AND REUNIFICATION
With respect to the statutory element of location and reunification, required for termination pursuant to General Statutes § 17a-112
(c)(1),[18] the court finds as follows:
1. WANDA A., THE MOTHER
The court finds by clear and convincing evidence that DCF did make reasonable efforts[19] to reunify Wanda A. with her children, under the circumstances of this case, as more specifically described at trial and through Affidavit 3, Exhibit 4-4. (See also Exhibit 16.) While DCF did not provide Wanda A. with a psychiatric examination, she was offered access to mental health counseling services through its referrals to CFS, FSW, the Curtis Home, and ABH although the respondent mother failed to make appropriate use of these critical services. DCF also assisted Wanda A. through the provision of transportation to and from visitation, and review of expectations and probation conditions. CT Page 2483
2. RUPERTO C., THE FATHER OF JONATHAN R.
As noted, Ruperto G. has not participated in these proceedings, although he was subject to court ordered service and notice.[20]
Accordingly, the court "finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts" within the meaning and application of § 17a-112 (c)(1).
3. DOUGLAS H., FATHER OF LISSETTE
Although Douglas H. has participated in these proceedings, from the evidence presented, including his long history of criminal activity and incarceration, his current sentence of incarceration, and his limited demonstration of interest in Lisette, the court "finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts" within the meaning and application of § 17a-112 (c)(1).
B. STATUTORY GROUNDS FOR TERMINATION
With respect to the statutory grounds for termination of parental rights, the court finds the following to have been established by clear and convincing evidence:
1. WANDA A., THE MOTHER
 a. ABANDONMENT — § 17a-112 (c)(3)(A)
The petitioner had previously claimed that that the statutory ground of abandonment exists as to the respondent mother, pursuant to the application of General Statutes § 17a-112(c)(3)(A).[21] To the contrary, the evidence in this case establishes that Wanda A. has exhibited relatively consistent interest in the well-being and progress of her children, has sufficiently participated in visitation, has often provided her children with trinkets and mementos, and has paid support for them while they reside in foster care. The evidence disclosed that Wanda A. has made reasonable efforts at visiting her children, notwithstanding her responsibility to provide care for Calep, the fact that she resides in a different city from her other children, and notwithstanding her demanding personal schedule. (Testimony of Sheryl P.) Thus, the respondent mother has maintained a continuing, vital and mutually satisfying relationship with each of her children, although she has not met each and every expectation concerning visitation or contact with them. (See Exhibits 16, 4-4; see also Part I. A. 2., 3., above.)
The evidence in this case reveals that Wanda A. has made more than a CT Page 2484 sporadic showing of interest, concern or responsibility for the welfare of her children. See In re Deana E., 61 Conn. App. 185, 193, ___ A.2d ___ (2000). She has expressed love and affection for them, has demonstrated some consistent concern over their health and well-being, has regularly contributed to their financial support. Her children thrive upon her devotion to them. Wanda A. has not abandoned her children in the sense that she has failed to maintain a reasonable degree of interest, concern or responsibility as to their welfare. In re Deana E., supra,61 Conn. App. 193.
b. PARENTAL FAILURE TO REHABILITATE — § 17a-112 (c)(3)(B)
The petitioner claims that the statutory ground of parental failure to rehabilitate supports the application for termination of Wanda A.'s parental rights pursuant to General Statutes § 17a-112 (c)(3)(B).[22]
While Wanda A. has partially attended to some of the court-ordered expectations, the overwhelming evidence establishes that as of October 28, 1999, Wanda A. had neither accomplished such personal rehabilitation as is contemplated by § 17a-112 (c)(3)(B), nor had she achieved such degree of rehabilitation as would encourage the belief that within a reasonable time, without a change in her attitude toward mental health treatment, considering the age and needs of her children, this mother could assume a responsible position in her children's lives. Accordingly, the court finds this issue in favor of the petitioner.
"`Personal rehabilitation as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent. . . . [Section 17a-112] requires the trial court to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable within a reasonable time. . . . [The statute] requires the court to find, by clear and convincing evidence, that the level of rehabilitation [he] has achieved, if any, falls short of that which would reasonably encourage a belief that at some future date [he] can assume a responsible position in [his] child's life.' (Citations omitted; internal quotation marks omitted). In re Eden F., [250 Conn. 674, 706, 741 A.2d 873
(1999).]. . . . [I]n in assessing rehabilitation, the critical issue is not whether the parent has improved [her] ability to manage [her] own life, but rather whether [she] has gained the ability to care for the particular needs of the child at issue.' (Internal quotation marks omitted). In re Shyliesh H., [56 Conn. App. 167, 180, 743 A.2d 165
(1999)." In re Sarah Ann K., 57 Conn. App. 441, 448, ___ A.2d ___ (2000). Thus, "[a]t the adjudicatory phase of the termination hearing, the ultimate issue faced by the trial court [is] whether the respondent was better able to resume the responsibilities of parenting at the time of filing the termination petition than [she] had been at the time of the CT Page 2485 child's commitment." (Citation omitted; footnote omitted). In re HectorL., 53 Conn. App. 359, 367, 730 A.2d 106 (1999).
The statutory framework created by § 17a-112 (c)(3)(B) requires the court not only to analyze the parent's rehabilitation as it relates to the needs of the particular child, but also to consider if such rehabilitation is foreseeable within a reasonable time. In re Hector L.,
supra, 53 Conn. App. 367 366-467. Because of the requirement that the court predict what may happen within a reasonable time after the filing of the TPR petitions, the court also must consider Wanda A.'s conduct after October 28, 1999. In this case, this was a period of approximately one year, during which time Wanda A. made no discernable progress in the crucial aspect of her personal rehabilitation process that focuses upon her need for mental health treatment.
As Dr. Swenson explained, because of Wanda A.'s personality traits and mental health status,[23] she is presently unable either to appreciate her need for emotional counseling and treatment, or the dire implications of her failure to comply with the court-ordered expectations on this subject. Wanda A.'s primary desire to succeed academically and professionally, and her absolute devotion to those achievements, has left her with insufficient time or energy to effectively meet the overwhelming demands from both her toddler and the specific steps. Given Wanda A.'s present psycho-social profile as described in Part I. A. 3., above, this exacting regimen burdens her with too much to handle comfortably and successfully, such that she is unable to meet the additional burdens that would result if she were the primary caretaker for three additional children, including Jonathan and Lissette who require therapeutic attention of their own.[24] (Testimony of Dr. Swenson.)
Under the circumstances of this case, the court finds logical and credible Dr. Swenson's opinion[25] that in spite of the fact that Wanda A. dearly loves her children and truly believes that she is competent to care for all of them, she is unable at present to understand that she is not capable of succeeding at work, at school, and as the primary caregiver for four young children. The court further credits in full Dr. Swenson's opinion that given Wanda A.'s psychological make-up, unresolved mental health disorders, and history of abusing Jonathan, if she were now to be saddled with the joys, vicissitudes and burdens of caring for four children at this time, additional physical abuse, frustration and neglect of the children would likely be repeated in the future. (Testimony of Dr. Swenson.)
The evidence in this case clearly and convincingly reflects Wanda A.'s historical inability or unwillingness to accept the fact that she needs mental health care. Although she appropriately commenced treatment with CT Page 2486 CFS in July of 1997, she voluntarily discharged herself from this necessary treatment. Her failure to follow through with counseling at CFS in 1998 or with FSW, and her failure to participate in the family therapy sponsored by The Curtis Home all confirm Wanda A.'s lack of honesty with herself concerning her mental health needs or, at the least, a disabling lack of insight into her plight. (Testimony of Dr. Swenson, Mark A.) Her experience with drug testing at ABH in 1998 and 1999 demonstrates her lack of veracity with potential counselors, as she denied drug use even in the face of laboratory analysis that established recent exposure to cocaine and marijuana. (Testimony of Jody K., Carmen T.) Wanda A.'s denial of her own problems is consistent with the diagnosis formulated by Dr. Swenson, attributing her failure to follow through with recommended substance abuse or mental health treatment to her untreated depression, anxiety, and personality disorder. (Testimony of Dr. Swenson.)
While Wanda A. attributes her failure to pursue counseling to her lack of funds, her argument is inconsistent with her ability to pursue her education, and her failure to follow through with those agencies who had accepted her for counseling, or who had indicated renewed interest in accommodating her needs. Wanda A. has argued that her obligations to her youngest son, who required close attention as the result of his medical fragility; her disagreeable relationship with the foster parents; and inconsistent provision of transportation to visitation by DCF all acted as impediments to her completion of counseling or maximization of visitation opportunities. Given Wanda A.'s attention to her schoolwork and her success at meeting work-related obligations, the court infers that the respondent mother was unwilling, rather than unable, to fulfil her obligation to successfully pursue the mental health counseling opportunities that were offered by CFS and FSW. (Testimony of Dr. Swenson, Jeanne C.)
To change her behavior or psychological profile in order to responsibly meet the needs of her children, Wanda A. would require commitment to a lengthy process of insight-oriented psychotherapy, with sessions up to three times a week for several years. This lengthy process will incorporate Wanda A.'s development of understanding that she needs to change herself personally, not merely academically and professionally. (Testimony of Dr. Swenson.) At the time of Dr. Swenson's evaluation in early 2000, however, Wanda A. had not established that her treatment to date would allow her, within a reasonable period of time, to be able to address all of the childrens' needs, particularly Jonathan's, in a way that would allow her to be their primary parent. Her personality does not preclude her from acquiring the ability to physically care for her children or to give them the emotional care they need. (Testimony of Dr. Swenson.) Her past unwillingness or inability to cooperate fully with the therapeutic process designated by the specific steps, derived from her CT Page 2487 untreated mental health conditions, has effectively precluded her from accomplishing this worthy goal. Although Wanda A. has very recently made lifestyle changes consistent with her stated objective of commencing counseling, she has not yet admitted the extent of her need for mental health support.
Based on all the evidence provided to the court, the evidence clearly and convincingly demonstrates that Wanda A. has not yet achieved the rehabilitation that would make her an appropriate candidate for provision of maternal services to these three children within a reasonable period of time, or that she has achieved such a level of rehabilitation as would reasonably encourage a belief that at some identifiable date in the future she could assume a responsible position in their lives, In re EdenF., supra, 250 Conn. 706. Accordingly, the court finds this issue in favor of the petitioner.
 c. No ONGOING PARENT-CHILD RELATIONSHIP — § 17a-112 (c)(3)(D)
The petitioner has previously claimed that the statutory ground of no ongoing parent-child relationship exists in this case as to Wanda A. and her children, pursuant to § 17a-112 (c)(3)(D).[26] The clear and convincing evidence in this case, as discussed in Part II. B. 1. a., establishes that the circumstances of this case do not "contemplate a situation in which, regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed between them, or has definitively lost that relationship, so that despite its former existence it has now been completely displaced." (Citations omitted.) In re John G., 56 Conn. App. 12, 22, 740 A.2d 496 (1999). Because Wanda A. has not served as the primary caretaker for her children since their removal from her custody, she cannot be shown to have met, on a day to day basis, their physical, emotional, moral and educational needs. However, in the context of Wanda A.'s relatively consistent attention to and valid interest in her children, and their positive response to her recurring maternal role in their lives, the legal elements intrinsic to § 17a-112 (c)(3)(D) cannot be demonstrated in this case.
In reviewing the substantial evidence submitted on this aspect of the original TPR petition, the court was mindful that "[i]n considering whether an ongoing parent-child relationship exists, the feelings of the child are of paramount importance. . . . The ultimate question is whether the child has no present memories or feelings for the natural parent." (Citations omitted.) In re John G., supra, 56 Conn. App. 23. Insofar as Jonathan, Lissette and Angelique are concerned, as these children have well-developed feelings of love and affection for their mother, their CT Page 2488 former connection with Wanda A. has not been displaced by their present reliance on Irma D. for maternal support. An ongoing parent-children relationship continues to exist, then, according to the standard established by In re John C.
Furthermore, a termination based on the grounds of no ongoing parent-children relationship must be based upon a determination that it would be detrimental to the children's best interest to allow additional time for such a relationship to develop. In re John G., supra,56 Conn. App. 22. As discussed in Part III. B. 1., below, this court has found continued contact with Wanda A. to be in the best interests of Jonathan, Lissette and Angelique. Under these circumstances, the petitioner could not have met her burden of proof under § 17a-112
(c)(3)(D) as the evidence supports a contrary conclusion.
2. RUPERTO G., THE FATHER OF JONATHAN R.
As Ruperto G. did not participate in these proceedings, and his "whereabouts are unknown." (Exhibit 16.) Accordingly, the court has relied upon the social studies (Exhibit 16, 4-4) in deciding these matters.
a. ABANDONMENT — § 17a-112 (c)(3)(A)
The petitioner claims that the statutory ground of abandonment exists in this case as to the respondent Ruperto G., within the meaning of §17a-112 (c)(3)(A). Ruperto G.'s "whereabouts are unknown." The uncontroverted evidence in this case establishes that he has "not maintained any contact with his child," and "has made no attempts to see or speak with his child since the commitment. He has provided no financial or emotional support, and have (sic) never given gifts to his child." (Exhibits 16, 4-4.) This evidence clearly and convincingly establishes that Ruperto G. has no measurable relationship with his son, and that he has abandoned this child in the sense that he has failed to maintain a reasonable degree of interest, concern or responsibility as to his welfare. Accordingly, the court finds this issue in favor of the petitioner.
 b. No ONGOING PARENT-CHILD RELATIONSHIP — § 17a-112 (c)(3)(D)
The petitioner further claims that the statutory ground of no ongoing parent-child relationship exists in this case, supporting the application for termination of Ruperto G.'s parental rights pursuant to § 17a-112
(c)(3)(D). The clear and convincing evidence in this case establishes that there is absolutely no ongoing parent-child relationship between CT Page 2489 this parent and his son, in terms of the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child.
Because the court has determined that no parent-child relationship exists, it must next consider whether to allow further time to develop such a relationship would be detrimental to the best interests of the child. As Ruperto G. has never expressed interest in having a relationship with Jonathan, it is reasonable to infer that additional time would not result in any change in his attitude. As further discussed in Part III. B. 2., below, it is clear that to allow further time for the establishment or reestablishment of such a parent-child relationship would be detrimental to Jonathan's best interests. Accordingly, the court finds this issue in favor of the petitioner.
3. DOUGLAS H., THE FATHER OF LISSETTE R.
 a. ABANDONMENT — § 17a-112 (c)(3)(A)
The petitioner claims that the statutory ground of abandonment exists in this case as to Douglas H., pursuant to § 17a-112 (c)(3)(A). The uncontroverted evidence in this case establishes that he has rarely called to inquire about the well-being or progress of Lissette, has sent no cards, letters or gifts, nor paid any support for her, and has requested only limited visitation with her. (Exhibits 16, 4-4.) Since his incarceration in late 1999, he has not requested visitation at all. (Testimony of Sheryl P.) The evidence clearly and convincingly establishes that Lissette recognizes her sister's father, not Douglas H., as her psychological father. Douglas H. has no measurable relationship with his daughter, and that he has abandoned this child in the sense that he has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of Lissette, as contemplated by In re Deana E., supra, 61 Conn. App. 193. Accordingly, the court finds this issue in favor of the petitioner.
b. PARENTAL FAILURE TO REHABILITATE — § 17a-112 (c)(3)(B)
The petitioner also claims that the statutory ground of parental failure to rehabilitate supports termination of Douglas H.'s parental rights pursuant to § 17a-112 (c)(3)(B). Proof of this ground requires that the petitioner provide, among other things, clear and convincing evidence that "such parent has been provided specific steps to take to facilitate the return of the child to the parent." Id. The evidence in this matter establishes that no such steps were established for Douglas H.[27] Accordingly, the petitioner cannot prevail on this ground, and the court finds this issue in favor of the respondent father. CT Page 2490
 c. No ONGOING PARENT-CHILD RELATIONSHIP — § 17a-112 (c)(3)(D)
The petitioner further claims that the statutory ground of no ongoing parent-child relationship supports the application for termination of Douglas H.'s parental rights pursuant to § 17a-112 (c)(3)(D).[28]
The clear and convincing evidence in this case establishes that there is absolutely no ongoing parent-child relationship between Douglas H. and Lissette, in terms of the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child. As discussed in Part III. B. 3, below, to allow further time for the establishment or reestablishment of such a parent-child relationship would be detrimental to the best interest of the child. Accordingly, the court finds this issue in favor of the petitioner.
The court credits Dr. Swenson's opinion that other than as companions who can pass time together, there was no ongoing parent-child relationship between Douglas H. and Lissette at the time of her evaluation in February of 2000. (Testimony of Dr. Swenson.) Lissette does not know exactly what role Douglas H. plays in her life, and she looks to others for fatherly support. (Exhibit 16.) The petitioner has met her burden of proving that no ongoing father-child relationship existed during the adjudicatory period as to Douglas H. and his daughter, Lissette.
 III. DISPOSITION
As to the dispositional phase of this hearing,[29] the court has considered the evidence and testimony related to circumstances and events up to and including October 24, 2000, the date upon which the evidence in this matter was concluded.
A. SEVEN STATUTORY FINDINGS
With respect to the seven written factual findings required by General Statutes § 17a-112 (d), the court has recorded its findings below. The court has considered the evidence and information relevant to each of these findings in the course of determining whether to terminate parental rights under this section.[30]
 1. TIMELINESS, NATURE AND EXTENT OF SERVICES — § 17a-112 (d)(1)
As to the timeliness, nature and extent of services offered, provided CT Page 2491 and made available to the parents and the children in this case by an agency to facilitate reunification, the court finds by clear and convincing evidence that appropriate and timely services were provided by DCF, including, as to Wanda A.: ABH, LMG, The Curtis Home, CFS and FSW, along with transportation to supervised visitation often scheduled on weekdays, evenings and Saturdays to accommodate the respondent mother. (Exhibits 16, EE.) As indicated in Part I, above, Wanda A. has not made full or effective use of these services. No services were provided for Ruperto G., who did not request services and was not available to receive them. (Exhibit 16). DCF admits that no recent services have been offered to Douglas H. during the pendency of this case, due to his incarceration. (Testimony of Sheryl P.) The evidence failed to disclose that Douglas H. has, of his own initiative, obtained specific parenting-related services through the DOC.[31]
 2. REASONABLE EFFORTS AT REUNIFICATION PURSUANT TO FEDERAL LAW — § 17a-112 (d)(2)
As to whether DCF has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980, this court finds by clear and convincing evidence that DCF made reasonable efforts in this matter, given the situation and circumstances here existing, given the unavailability of Ruperto G. and Douglas H., and recognizing Wanda A.'s persisting problems in achieving rehabilitation. The court notes that DCF has offered and provided services as outlined in Exhibit 16, the Social Study, and as more specifically referenced at trial. (Testimony of Sheryl P.) The court finds that the action of DCF to institute termination proceedings is consistent with the federal law designed to eliminate foster care drift and to secure permanent placement for children, such as Jonathan, Lissette and Angelique, who are in foster care.
3. COMPLIANCE WITH COURT ORDERS — § 17a-112 (d)(3)
As to the extent to which all parties have fulfilled their obligations under the terms of any applicable court order, the court notes that neither Ruperto G. nor Douglas H. have been a party to any such orders. (Exhibit 16.)
Reasonable and realistic expectations were established as orders for Wanda A. on July 29, 1997.[32] The court further finds by clear and convincing evidence that Wanda A. has complied with some of these expectations, such as attendance at parenting and child development classes, and maintenance of an appropriate home on certain occasions. (Testimony of Sheryl P., Wanda A. Compare Exhibit 16.) Wanda A. has also provided financial support for her children. (Exhibit 16; Testimony of CT Page 2492 Wanda A.)
Wanda A. has failed to comply with her obligation to visit with the children as often as DCF permitted, although she has participated in visitation to a very significant degree. She failed to appropriately cooperate with and become involved in Jonathan's therapy. She has failed to consistently notify DCF of her change in address, as required by the expectations at issue. Despite the clear evidence that she is not substance addicted, she has used both cocaine and marijuana during the pendency of this matter, notably infrequently yet in absolute violation of both the law of this state and the text of the court-ordered expectations to which she was subject. (Testimony of Sheryl P., Carmen T.) Wanda A. has committed larceny and violated the motor vehicle laws of this state during the pendency of these expectations.
It is significant that Wanda A. has failed to adequately comply with the specific expectations addressing her mental health, specifically failing to complete individual therapy as discussed in Part II. B. 1. b., above.
 4. FEELINGS AND EMOTIONAL TIES OF THE CHILDREN — § 17a-112 (d)(4)
As to the feelings and emotional ties of Jonathan, Lissette and Angelique with respect to their caretakers, the court finds by clear and convincing evidence that the children have developed a strong attachment to their current foster parents, whom they call Grampa and Mami. (Exhibit 16; Testimony of Eduardo D.) The court finds, as well, that each of these children has an equally strong and very vital bond with their biological mother, Wanda A. (Testimony of Dr. Swenson; Exhibit 16.) This relationship is based upon her demonstration of genuine love and affection for the children, her attentiveness to them during visits, and the consistency of her interest in their well-being. Wanda A. remains the "mother" of these children on a very meaningful level, despite the supportive care they have received while living in the D. family home.
The court finds that Lissette has no measurable emotional attachment to her biological father, Douglas H., and that Jonathan has no measurable emotional attachment to his biological father, Ruperto G.
5. AGE OF THE CHILDREN — § 17a-112 (d)(5)
As noted, Jonathan is eight years old, and presents with special needs relating to his conduct and learning styles. Lissette is nearly five, and Angelique is four. The court finds, based on the clear and convincing evidence presented at trial, that these children require continuing CT Page 2493 contact with their biological mother in order to maximize their opportunity for healthy emotional and social development. (Testimony of Dr. Swenson.) Although they would no doubt benefit from closure of the issues related to whether or not their biological mother will be able to assume a responsible position in their lives within in a reasonable period of time, the court finds most compelling the strong emotional ties they have maintained with Wanda A. despite the three and a half years they have spent in foster care. However, no such bonds exist as to Jonathan and Lissette with their fathers. Given the ages and needs of these children, the court finds that their need for permanency and stability outweighs any potential benefit related to maintaining a relationship with either Ruperto G. or Douglas H. In re Hector L.,
supra, 53 Conn. App. 366-67.
 6. EFFORTS MADE BY THE PARENTS TO ADJUST THEIR CIRCUMSTANCES — § 17a-112 (d)(5)
As to the efforts each parent has made to adjust his or her circumstances, conduct or conditions to make it in the best interest of any of these children to return to a parent's home in the foreseeable future, the evidence in this case clearly and convincingly indicates that Ruperto G. has done nothing that would enable him to maintain due contact with Jonathan or his foster family. Respecting the limits imposed by his incarceration, the court nonetheless finds that Douglas H. has failed to make appropriate or adequate changes in his circumstances to effectively establish a basis for determining that Lissette should ever return to his custody. See In re Shane P., supra, 58 Conn. App. 256. While Douglas H. has maintained some recent contact with Lissette, the court received no evidence that he has made any significant contributions to her well-being. There was insufficient evidence from which the court could conclude that Douglas H. has regularly sent his daughter written correspondence, holiday greetings, mementos or gifts of any nature. Similarly, there was insufficient evidence from which the court could conclude that he had made regular inquiries about her by using the DCF caseworkers as a conduit. In sum, Douglas H. has not made reasonable efforts to adjust his circumstances, conduct or conditions to incorporate Lissette's needs into his life.
The court further finds that during the adjudicatory period, Wanda A. failed to appropriately adjust her circumstances so as to make appropriate use of the individual and family therapy programs and she has thus had not made meaningful or sustained efforts to conform her conduct to the standards appropriate for reunification with her children. Currently, Wanda A. has engaged in valuable visitations with her children, and she is prepared to place her own education on hold and to amend her work schedule in order to focus on the children. However, her CT Page 2494 failure to identify her own need for thorough mental health counseling and her failure to adequately attend to her mental health needs demonstrate that she is not yet committed to establishing and maintaining a stable primary caretaking relationship with Jonathan, Lissette and Angelique. See In re Michael L., supra, 56 Conn. App. 694. Additional time and commitment to mental health therapy and treatment would likely bring Wanda A.'s performance, as a parent, within acceptable standards sufficient to make it in the best interests of the children for them to be reunited with their biological mother. However, the many years required for this therapeutic regimen, as described by Dr. Swenson, make their return to Wanda A.'s home inappropriate at this time.[33]
 7. EXTENT TO WHICH PARENTS WERE PREVENTED FROM MAINTAINING RELATIONSHIPS WITH THE CHILDREN — § 17a-112(d)(6)
As to the extent to which either Ruperto G., Douglas H. or Wanda A. have been prevented from maintaining a meaningful relationship with their children, by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent, the court finds, by clear and convincing evidence, as follows:
While the evidence reflects that Douglas H. was incarcerated, no other extrinsic factors were shown to have existed, other than the structure of the foster care system in general, which prevented regular, continuing contact with either Lissette or her foster family. As noted above, the evidence shows, instead, that Douglas H. failed to adequately initiate such contact, and thereby himself created a barrier to the relationship.
Insufficient evidence was presented from which the court could conclude that any circumstances, other than his own absence, prevented Ruperto G. from maintaining a meaningful relationship with Jonathan.
As to Wanda A., although time living apart from the children acted as a partial barrier to maintaining the mother-children relationship, Wanda's criminal activities involving the foster family served as a reasonable basis for the discontinuation of close relationships with her children's caretakers. (See Exhibit 16.) While Wanda A. claims that economic factors, including her demanding work schedule, responsibilities for her youngest child, and her school schedule, impeded her visitation, the court finds that DCF made reasonable efforts to arrange for visitation that would not conflict with Wanda A.'s burdensome agenda. In sum, no extrinsic circumstances, other than the effects of her own larcenous behavior and the structure of the foster care system in general, prevented the respondent mother from maintaining a relationship with her children. CT Page 2495
B. BEST INTERESTS OF THE CHILDREN — § 17a-112 (c)(2)
The court is next called upon to determine whether termination of the parental rights of Wanda A. would be in the best interests of Jonathan, Lissette and Angelique, and whether the termination of the parental rights of Ruperto G. and Douglas H. would be in the best interests of Jonathan and Angelique.[34] "Termination of parental rights means the complete severance by court order of the legal relationship, with all its rights and responsibilities, between the child and the child's parent or parents. . . . Termination of parental rights is a most serious and sensitive judicial action. In re Barbara J., 215 Conn. 31, 44, 574 A.2d 203
(1990)." In re Steven N., 57 Conn. App. 629, 632, ___ A.2d ___ (2000). "[T]he question . . . to be decided in a dispositional phase is whether it is in the best interests of the child to sever the parent-child relationship. That is different from the question of who should have custody of the child if termination of parental rights is determined to be in the best interests of the child. See Practice Book § 33-5." Inre Carissa K., 55 Conn. App. 768, 776, 740 A.2d 896 (1999). "In making this determination, the trial court can consider all events occurring prior to the date of the dispositional hearing, including those occurring after the filing of the termination petition." (Citation omitted.) In reKasheema L., 56 Conn. App. 484, 488, 744 A.2d 441 (2000).
1. WANDA A.
In determining whether termination of Wanda A.'s parental rights would be in the best interests of Jonathan, Lissette and Angelique, the court has examined the multiple relevant factors. These factors include, among other things, the length of the children's stay with their foster parents; the nature of their relationship with their foster parents; the nature of their relationship with Wanda A.; and the degree of contact maintained with her. In re Savanna M., 55 Conn. App. 807, 816, 740 A.2d 484
(1999) (considering best interests in the context of a claim of no ongoing parent-child relationship). "In addition, the genetic bond shared by a biological parent and his or her child, although not determinative of the issue of the best interest of the child, is certainly a factor to consider." (Citations and quotation marks omitted.) Id. In a matter such as this, the court is further called upon to balance the children's intrinsic needs for stability and permanency against their manifest need to remain connected to their biological mother. Pamela B. v. Ment,244 Conn. 296, 314, 709 A.2d 1089 (1998). Applying this analysis to the circumstances presented in this matter, the clear and convincing evidence in this matter establishes that it is in the children's best interests to continue to maintain, and not to terminate, their relationship with Wanda A., which serves the concomitant purpose of deepening the genetic bond CT Page 2496 they share with Wanda A. See In re Savanna M., supra, 55 Conn. App. 816.
The evidence clearly and convincingly reveals that staunch bonds exist between Wanda A. and her children, and that she is capable of maintaining a valuable and valid relationship with them notwithstanding her failure to become rehabilitated. Jonathan, Lissette and Angelique have gained significant benefits from Wanda A.'s expressions of love and affection, and from her clarion devotion which has withstood the prolonged period of time they have spent in foster care. Despite their comfort level with their foster parents, each of these children maintains a strong identification of Wanda A. as their "mother". There was no evidence presented from which the court could conclude that if they were permanently deprived of regular access to Wanda A., each would not suffer the lasting and potentially irreparable harm that would likely result from wresting such a mother figure from their young and fragile worlds.
The evidence in this matter contained repeated, compelling factual references which clearly and convincingly militate against termination of Wanda A.'s parental rights at this time. The evidence was replete with the petitioner's own observations which reflected consistent bonding, attachment and genuine mutual affection between this mother and her children. DCF's own Running Narrative documents contain multiple recitals of the children's long-standing love for Wanda A., and the depth of Wanda A.'s love for these children in return, without explicating how these children could be positively affected by termination of Wanda A.'s parental rights. The unrestricted closeness of the parent-children relationship in this case is reflected, for instance, in a DCF report referring to a visit on November 8, 1999: "We drove to a pizza place. There mother interact appropriately with her children. Lissette gave mother a picture that she draw at the day care. Mother said to her thank you, this is beautiful. Throughout the visit mother and children keepsaving to each other I love you. The visit went well." (Emphasis added.) (Exhibit A.) For the visit on November 15, 1999, DCF wrote: "At the end of the visit mother gave Jonathan something that she brought for him and she gave the girls some Barbie dolls stickers with the case. Girls gave mother a big kiss and they said thank mom. Throughout the visit, thechildren kept telling mother "mom I love you" To that mother responded,"Oh, that is veiy nice, and you know something I love you too." (Emphasis added.) (Exhibit B.) Pertaining to a visit on January 10, 2000, DCF stated: "Mother brought them three new pair of sneakers. The children were very happy with them. When the visit was over . . . Angelique did not want mother to let go. Mother talked to her and calm her down." (Exhibit G.) On February 28, 2000, it was noted that: "When the visit was done, we then took the girls back to the day care. The girls hung ontomother and they started to cry. This is every time we take them back." (Emphasis added.) (Exhibit M.) The DCF note for March 6, 2000 states: CT Page 2497 "When we dropped the girls up at the day care, both started to crying. Angelique did not want to let mother go. It was like never before. She usually cries, but when the staff take her inside she calm down, but yesterday Angelique was crying, yelling, screaming, saying Mom I want to go home with you. Mother gave her a kiss and [the DCF worker] told mother to please keep walking." (Exhibit O.) On June 7, 2000, DCF reported: "This Worker transported [Wanda A.] and the children to a local Burger King. She interacted wonderfully with her children. She hugged and kissedthem. She spent quality time with each of the children. The visit wasvery positive and engaging." (Emphasis added.) (Exhibit AA.)[35]
The observations of the children's counsel and their GAL provide further support for the court's determination that termination of Wanda A.'s paternal rights will not serve the best interests of Jonathan, Lissette and Angelique. Jonathan's lawyer and the children's GAL have urged the court to deny TPR as to Wanda A., focusing upon the closeness that persists between Jonathan, Lissette, Angelique and their biological mother, notwithstanding their long term in foster care. Jonathan's counsel has further argued that even though Wanda A. remains in need of intensive psychotherapy, it would be adverse to this child's best interests to require him to sever his relationship with his mother. Counsel for Lissette and Angelique have argued that these children most frequently voice their desire for reunification with their mother, although they also express a desire to live with foster parents. The GAL has implored the court to note the significance of the children's strong emotional ties with Wanda A., arguing that "these children are strongly bonded with and love their mother." The GAL emphasized that a hardship and burden of great severity would result to the children if the TPR petition were granted against Wanda A., given the strength of their attachment to their biological mother, as measured by Dr. Swenson. The GAL thus recommends that the court acknowledge that termination of Wanda A.'s parental rights would be fundamentally contrary to the best interests of the children in this case.
The psychologically based opinions of Dr. Swenson provide additional compelling support for the court's conclusion that the best interests of these children will not best be served through termination of Wanda A.'s parental rights.[36] Dr. Swenson derived her opinions from her personal observations that further support the continuation, not the termination, of this maternal-children relationship. Based on her evaluations, conducted some two and a half years after the children were placed in foster care, Dr. Swenson opined that "it was clear that the children loveand are bonded with their mother. . . . The interaction between [Wanda A.] and her three older children went smoothly and appeared warm and satisfying for all. There is a strong and loving relationship between thechildren and their mother." (Emphasis added) (Exhibit 4a.) Dr. Swenson CT Page 2498 also commented upon the laudable presence of Wanda A.'s valid and effective parenting skills, which serve as a firm basis for the childrens' consistent attachment to her. As Dr. Swenson remarked: "Throughout the session, [Wanda A.] demonstrated a wonderful ability to attend to all of the children, reinforcing and praising them and making sure that she interacted with Lissette, who tended to not pull for her mother's attention. [Wanda A.] got on the floor with the children as soon as she entered the playroom and remained engaged with them throughout. She had brought sandwich fixings and, midway through the session, organized the children in making sandwiches, letting them do as much on their own as they could or wanted. . . . They all joined in conversation together while eating. At one point, Lissette became tearful and went to hug her mother. The other children joined in hugging their mother. [WandaA.] responded in a warm and comforting way, with all of them clearlysavoring the moment. During an art project toward the end of our session, Angelique spontaneously hugged her mother, saying `I love you, mom.'" (Emphasis added.) (Exhibit 4a.) Dr. Swenson thus noted a firm experiential basis for the mother-children relationships that have weathered the intervening years of foster care.
Dr. Swenson has cautioned that due to Wanda A.'s regrettable non-compliance with the recommended regimen of psychotherapy, the respondent mother is now capable of responding to the children's needs "on a short-term basis" but not as their primary caregiver. (Exhibit 4a; Testimony of Dr. Swenson.) Such qualification does not, however, deflect the strength or validity of the bond between these children and the biological mother whom they clearly adore, and who has continued to figure prominently in their lives even while they reside with Eduardo and Irma D. From Dr. Swenson's analysis, it is clear that the children's devotion to their mother is based on experience, and a well-established relationship of mutual trust, attention and affection. Their love for Wanda A. is not based on illusion, fantasy, or unrequited sentiment, but upon genuine appreciation of the roles played by mother and child in this unit which remains a family, even in the face of the prolonged separation.
In opining on the subject of the children's best interests, Dr. Swenson sought the best of all worlds, and suggested an outcome which the parties agree is outside the enforceable parameters of § 17a-112 (c): she has stated that the most beneficial outcome for this case would allow Jonathan, Lissette and Angelique to maintain regular on-going contact with their mother, accompanied by termination of Wanda A.'s parental rights and placement of the children with Eduardo and Irma D.[37]
(Exhibit 4a; Testimony of Dr. Swenson.) This aspect of the psychologist's opinion represents a salutary attempt to fashion, in clinical terms, a remedy for the family's dilemma which balances the children's need to CT Page 2499 maintain and develop a strong maternal bond with Wanda A., while ensuring that their daily physical and emotional needs are met on a consistent basis. Here, however, it falls to the court to fashion a solution which meets the best interests of the children in this case, within the bounds of the established legislation, which would allow Wanda A. to continue to play a fundamental role in the lives of Jonathan, Lissette and Angelique while recognizing that she has not yet met her obligation to obtain appropriate mental health care.
The petitioner has argued that termination of Wanda A.'s parental rights, with adoption by Eduardo and Irma D., will best fulfill the need to provide the permanent and stable living environment these children require. The petitioner has emphasized evidence establishing that the foster parents are prepared to adopt these children, promoting the strong relationship that they have developed with their foster parents. See Inre Savanna M., supra, 55 Conn. App. 816. In resolving the issues related to the best interests of the children in this case, however, the court has considered the potential that, under the circumstances of this case, termination of Wanda A.'s parental rights will result in the nearly complete, or even permanent, severance of the maternal-child relationships. "[T]ermination of parental rights is the ultimate interference by the state with the natural rights of parents in their children, resulting in everlasting severance of the legal relationship,and usually the permanent separation of parent and child as well. . . ." (Citations and internal quotation marks omitted; emphasis added.) In reSteven N., supra, 57 Conn. App. 632.
In some cases, the court might reasonably foresee that an adopting family would be likely to keep open the door between a terminated parent and the children at issue, allowing a biological parent-children relationship to flourish notwithstanding a decision to terminate parental rights.[38] However, the evidence in this matter provided scant basis for inferring that the current foster parents would permit Wanda A. to maintain an effectively close attachment to her children following a termination order. While, as noted above, Eduardo D. appears to be relatively cordial to Wanda A., there is no such evidence to indicate that Irma D. maintains any but hostile emotions toward the mother of her foster children. Eduardo D. has spontaneously indicated that he would welcome Wanda A.'s increased interaction with the children.[39] Irma D. is, however, aversive to Wanda A., and they even avoid communication with each other. (Exhibits Y, DD.) In the presence of this hostility between the foster and biological mothers, and in the absence of confirmatory testimony from Irma D., the court is constrained to give little credit to the portion of Eduardo D.'s testimony suggesting that his family was likely to provide enhanced visitation opportunities for Wanda A. on a voluntary basis. (See Testimony of Eduardo D.) As Dr. CT Page 2500 Swenson and the GAL have concluded, "ongoing and periodic contact with their mother" is fundamental to the children's well being. (Exhibit 4a.) Thus permanent severance of the children's legal relationship with Wanda A. raises the lamentable specter of absolute, permanent separation from their biological mother, a result which would be clearly contrary to their best interests, In re Steven N., supra, 57 Conn. App. 632.
Fortunately, our appellate decisions have contemplated the factual circumstances in which it is "possible for a court to find that a statutory ground for termination of parental rights exists but that it isnot in the best interests of the child to terminate the parental relationship . . . (Citation omitted; emphasis added.) In re Denzel A.,53 Conn. App. 827, 832, 733 A.2d 298 (1999) (child's intervening grandparent sought to delay the termination of parental rights so that she could develop a relationship with the child and adopt him. This court has found itself faced with such a situation in the present case, involving Wanda A., her failure to obtain the requisite mental health care treatment, and the best interests of her children Jonathan, Lissette and Angelique.
Fortunately, as well, the evidence clearly and convincingly established that the foster parents are also willing to provide long term care for the children, without adoption.[40] Enhanced maternal visitation, with long term foster care in an appropriate setting, would serve the salutary purposes of allowing the children to remain safely supervised by the foster family while Wanda A. carries through her commitment to rehabilitation, and concomitantly permitting the parent-children relationship to remain intact. The potential for long-term foster care is especially significant in the present case, as it remains clear that Wanda A. is not now in a position to serve as her children's primary caretaker. For the reasons expressed in Part II. B. 1. b., above, she has yet failed to forge the personality tools which would allow her to make consistently rational decisions about her children's needs on a long term basis, or to effectively manage them in a home setting. (Testimony of Dr. Swenson.)
Wanda A. has argued that she intends to timely commence a multi-year counseling program, and to attend two to three times a week, as recommended by Dr. Swenson. (Testimony of Wanda A.) She has revised her educational and professional goals, to allow her to maintain lawful employment while providing the time to care for and attend to her children. However, given her history of failed efforts, Wanda A. must bear the responsibility of progressing and succeeding with her mental health rehabilitation prior to receiving condonation from the court by way of reunification with her children, to corroborate her good intentions before she can be charged with the care of her children. In CT Page 2501 the interim, Wanda A.'s children should be permitted to maintain regular and consistent contact with her, while their safety and security is maintained through appropriate foster care placement.[41]
In summary, consistent with the substantial clear and convincing evidence in this case, the court adopts the recommendations of counsel for the children and the GAL in this matter, and finds that termination of Wanda A.'s parental rights will not serve the best interests of Jonathan, Lissette and Angelique. As the petitioner has failed to meet her burden of proving, by clear and convincing evidence, that termination of Wanda A.'s parental rights is in the best interests of these children, this issue is found in favor of the respondent mother. General Statutes § 17a-112 (c)(2).
2. RUPERTO G.
Jonathan's counsel has observed that the evidence in this case fails to demonstrate a basis for denying the TPR petition against Ruperto G. The court has received no evidence upon which it could reasonably base a conclusion that it would be in Jonathan's best interests to maintain any relationship with his biological father. Rather, the court finds, by clear and convincing evidence, that the goals of permanency and security in placement will best be served by terminating Ruperto G.'s parental rights as to Jonathan. General Statutes § 17a-112 (c)(2).
3. DOUGLAS H.
Douglas H. plays no role of note in Lissette's life, and the court has received insufficient evidence upon which it could reasonably determine that he will ever be capable of serving as a responsible parent for this child. Lissette's best interests will be served if she is freed from the potential that her biological father may choose to seek reunification in the future, so that she may enjoy the stability and security of knowing that her well-being is maintained now through foster care, without intervention by her biological father. Accordingly, the court finds, by clear and convincing evidence, that it is in Lissette's best interests to terminate the parental rights of Douglas H. General Statutes § 17a-112
(c)(2).
 IV. ORDERS
A. AS TO WANDA A.
The court, having considered all the statutory criteria and having found by clear and convincing evidence that the petitioner has prevailed on the grounds related to Wanda A.'s failure to achieve rehabilitation, CT Page 2502 and having further determined, upon all of the facts and circumstances presented, that it is in the best interests of Jonathan, Lissette and Angelique that if her parental rights remain intact at this time, this court accordingly ORDERS that the pending petition for termination of Wanda A.'s parental rights is hereby DISMISSED.
B. AS TO RUPERTO G.
The court, having considered all the statutory criteria and having found by clear and convincing evidence that the grounds of abandonment and no ongoing parent-child relationship exist for termination of parental rights as to Ruperto G. and that it is in the best interests of Jonathan to terminate his biological father's parental rights, this court accordingly ORDERS that the parental rights of Ruperto G. are hereby terminated as to Jonathan R.
C. AS TO DOUGLAS H.
The court, having considered all the statutory criteria and having found by clear and convincing evidence that the grounds of abandonment and no ongoing parent-children relationship exist for termination of parental rights as to Douglas H. and that it is in the best interests of Lissette to so terminate her biological father's parental rights, this court accordingly ORDERS that the parental rights of Douglas H. are hereby terminated as to Lissette R.
D. FURTHER ORDERS
 1. AS TO WANDA A.
a. Wanda A. is hereby ordered to continue to comply with the expectations issued on July 29, 1997, and ratified by the court on August 28, 1998.
b. Wanda A. is specifically ordered to immediately engage in a therapeutic regimen in accordance for treatment of her personality and mental health disorders. She is further ordered to engage in counseling directed at improving her inter-personal skills, to enhance her relationship with her DCF caseworkers and with the foster parents who care for her children. Failure to comply with this condition shall constitute grounds for the modification of the orders set forth in Part IV. C. 2., below.
c. Wanda A. is ordered to cooperate with DCF in developing a plan for enhancing her attendance at and participation in her children's school activities. CT Page 2503
2. AS TO THE PETITIONER
a. The petitioner shall remain the custodian of Jonathan, Lissette and Angelique, pursuant to prior court order.[42]
b. The petitioner shall take all reasonable steps to ensure that Jonathan, Lissette and Angelique remain together in foster placement.
c. The petitioner shall take all reasonable steps to ensure that the mental health needs of Jonathan, Lissette and Angelique are met during the course of their continued foster placement.
d. The petitioner shall make new and renewed efforts at reunification of Wanda A. with her children, including but not limited to submission of applications for extension of commitment, specific referrals for mental health services, continued provision of transportation to visitation, and facilitation of all orders set forth in Part IV. C. 1., above.
e. The petitioner is ordered to enhance Wanda A.'s opportunities for interaction and visitation with her children, by providing counseling to the current foster parents directed at improving their understanding of the importance of maintaining an active role for her in the lives of Jonathan, Lissette and Angelique; minimizing their interference with Wanda A.'s attendance at and participation in her children's school activities; and enhancing their inter-personal relationship with Wanda A.
f. The petitioner is further ordered to work with Wanda A. to establish and implement a visitation schedule which accommodates the fact that Wanda A. resides at a distance from the children, but which nonetheless increases the frequency, duration and quality of visitation opportunities made available to this mother and to her children. Upon Wanda A.'s successful involvement in a mental health treatment regimen, it is anticipated that further enhancements of the visitation program will be implemented.
3. AS TO WANDA A. AND THE PETITIONER
a. Any party may petition the court for an order that Wanda A. be required to submit to a psychiatric examination.
b. The petitioner and Wanda A. shall cooperate in the payment of Wanda A.'s mental health care expenses, as she shall not be required to bear an undue financial burden while complying with these orders. CT Page 2504
c. Wanda A. and DCF are ordered to cooperate with counsel for the minor children and their GAL in the identification of appropriate information for disclosure concerning the potential for reunification. Only designated appropriate information concerning court-related matters may be disclosed to the children. (See Exhibit W.)
BY THE COURT,
N. Rubinow, J.